FILED & JUDGMENT ENTERED
Steven T. Salata

July 28 2022

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **JTR1, LLC,** | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | Case No. 20-30141 |
| | ) | |
| | ) | |
| **A. BURTON SHUFORD, TRUSTEE OF THE BANKRUPTCY ESTATE OF JTR1, LLC f/d/b/a JTR, LLC,** | ) ) ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 22-3004 |
| v. | ) | |
| | ) | |
| **RICHARD KEARNS and YSBELL KEARNS,** | ) ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| **A. BURTON SHUFORD, TRUSTEE,** | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 22-3008 |
| v. | ) | |
| | ) | |
| **MARK MULLADY,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

**IN THESE MATTERS,** the Plaintiff filed a Complaint on February 3, 2022, seeking to avoid and recover transfers from Defendants Richard and Ysbelle Kearns. On February 4, 2022, the Plaintiff filed a Complaint, seeking to avoid and recover transfers from Defendant Mark Mullady. The Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions"), seeking to dismiss the lawsuits for failure to state a claim upon which relief can be granted. For the reasons set forth below, the court grants the Motions.

## **BACKGROUND**

The Debtor's bankruptcy filing is the result of its involvement in investments made by the defined benefit pension plan of Freedom Communications, Inc. ("Freedom")—a media newspaper company based in California. In 2012, Aaron Kushner and Eric Spitz acquired Freedom. At the time of the purchase, Freedom sponsored a single-employer defined benefit pension plan covered by the pension plan termination insurance program established under 29 U.S.C. §§ 1301–1461 ("ERISA"). Freedom's pension plan (the "Freedom Plan") was underfunded when Kushner and Spitz acquired it, requiring Freedom to make contributions to the Freedom Plan.

Richard Covelli, in his personal capacity and through the Debtor, assisted Kushner and Spitz in an effort to decrease the funding contributions required under ERISA by boosting the book value of the Freedom Plan's assets. In early 2014, the Freedom Plan transferred $9,400,025 into a money market account on the advice of Covelli, the Debtor, Covelli's closely held corporation, and others. From that account, Covelli, the Debtor, other related entities, and their retained professionals[1] orchestrated the purchase of over $7 million in insurance policies insuring the lives

---

[1] The Debtor and Covelli paid several individuals and entities in connection with their effort to boost the book value of the Freedom Plan's assets. These entities include the Defendants, as well as other individuals and corporations that are defendants in other adversary proceedings. Some of those defendants, including JMC Financial Holdings, LLC; TMC Financial, LLC; BJS Insurance, LLC et. al.; and Etaros Actuarial Services, LLC et. al. also filed motions to

2

of Freedom Plan participants. This greatly increased the perceived value of the Freedom Plan's assets according to the accounting methodology used by Covelli and the Debtor in the transaction. The remaining funds in the money market account were used to pay the fees of Covelli, the Debtor, and the other related entities. It later became apparent that this methodology was improper and potentially violated ERISA law. It also failed to boost the value of the Freedom Plan's assets.

In September 2014, the Debtor and Covelli advised Kushner and Spitz on a different approach to lowering the ERISA contribution requirements—by having the Freedom Plan invest in life settlement agreements through loan agreements with unrelated owners of life insurance policies. The Freedom Plan invested approximately $32 million into LT Funding, a subsidiary of the Freedom Plan, and LT Funding loaned millions of dollars to over 80 irrevocable life insurance trusts (the "LT Funding Transaction"). The irrevocable life insurance trusts then used the funds to pay premiums on those life insurance policies with the expectation that the Freedom Plan would receive a percentage of the death benefits upon the passing of the insured. The Debtor and Covelli were paid at least $13 million by the Freedom Plan in connection with their role in the LT Funding Transaction.

In theory, the book value assigned to the loans decreased or eliminated the funding deficit of the Freedom Plan; however, the valuations used were inaccurate and potentially improper. As a result of the LT Funding Transaction, the Freedom Plan lost nearly all its cash outlay and remained underfunded.

Freedom ultimately filed a Chapter 11 bankruptcy in the Central District of California. The Pension Benefit Guaranty Corporation (the "PBGC") was appointed as a member of the unsecured creditors committee in that case (the "Committee"). The PBGC is a wholly owned United States

---

dismiss in their respective adversary proceedings joining in the arguments of the Defendants. Separate orders will be entered with respect to those adversary proceedings.

government corporation established to administer ERISA's defined benefit pension plan termination insurance program. The PBGC guarantees the payment of certain pension benefits after the termination of pension plans covered by ERISA. The PBGC also typically becomes the statutory trustee of a terminated plan. The PBGC is currently the statutory trustee of the Freedom Plan and is currently the largest unsecured creditor in the Freedom bankruptcy.

In January 2017, the Committee in the Freedom bankruptcy case filed an adversary proceeding against the Debtor in this case (JTR1), Covelli, and many other related entities. Among other claims, these parties were accused of aiding and abetting breach of fiduciary duty for its role in the Freedom Plan's attempt to boost the book value of its assets.

In February 2019, the PBGC filed its own lawsuit in the District Court of Central California (the "DCCC") asserting claims against the Debtor for participating in prohibited transactions under ERISA. The Committee's adversary proceeding was withdrawn to the DCCC, and the DCCC consolidated the two lawsuits a month prior to the filing of this bankruptcy. The total liability asserted against the Debtor in the two lawsuits exceeded $110 million.

As a result of these lawsuits, the Debtor filed this Chapter 7 bankruptcy on February 6, 2020. Pursuant to the terms of a settlement agreement approved by this court on May 12, 2021, the PBGC now holds an allowed unsecured claim in this case in the amount of $6,645,541.

The Debtor made various cash transfers between 2014 and 2018 to other entities prior to filing bankruptcy. Among the transferees were Richard Kearns, Ysbell Kearns, and Mark Mullady (the "Defendants"). Specifically, the Debtor transferred approximately $76,979.28 to Mark Mullady from December 31, 2014 to April 2, 2015, and approximately $1,376,659 to Richard and Ysbell Kearns from December 31, 2014 to December 31, 2015 (the "Transfers").

4

In February 2022, the Chapter 7 Trustee, on behalf of the Debtor's estate, commenced adversary proceedings against these Defendants, as well as the other participants in the alleged scheme. The majority of the counts in each of the complaints seek to avoid and recover the money transferred to the Defendants under 11 U.S.C. §§ 544(b), 548, and 550. The Trustee maintains that these transfers were made in connection with an unlawful scheme to lower the book value of the Freedom Plan's assets. The Trustee further alleges that these transfers were not payments on debts owed by the Debtor, and thus, the Debtor did not receive reasonably equivalent value in exchange. In short, the Trustee argues that the Transfers are avoidable fraudulent transfers.

The Transfers in the present case occurred more than four years prior to the petition date, and therefore, neither Section 548, nor the North Carolina Uniform Voidable Transactions Act (the "UTVA") are available. The former has a two year look back window; the latter, four years.

Instead, the Trustee desires to step into the shoes of the PBGC and use the fraudulent transfer provisions of the Federal Debt Collection Procedures Act (the "FDCPA") as the basis for recovering the Transfers. The FDCPA affords the Government a six-year look back period. If the Trustee cannot take advantage of the six-year look back period, then he cannot recover any of the Transfers.

In late March and early April of 2022, the Defendants filed the Motions. The primary argument of the Defendants is that the Trustee lacks standing to bring the avoidance actions pursuant to § 544(b) because a bankruptcy a trustee is not permitted to step into the shoes of the PBGC to assert the FDCPA provisions. The Trustee filed responses (the "Responses") to the Motions in mid-April of 2022.

The Motions first came on for hearing on May 31, 2022. After post hearing briefing to address additional issues identified during the hearing, the Motions came back on for a continued

hearing on June 14, 2022. The court then announced a ruling partially resolving the Motions, and the parties requested a continuance to confer on how to proceed given the commonality of issues between the various adversary proceedings. The Motions came back on for hearing a third time on June 22, 2022, and the procedural issues having been addressed, the matter was taken under advisement.

## DISCUSSION

The primary issue before the court is whether the Trustee pursuant to 11 U.S.C. § 544(b) may step into the shoes of the PBGC and exercise the fraudulent transfer provisions of the Federal Debt Collection Procedures Act (the "FDCPA") as the basis for avoiding and recovering the Transfers from the Defendants.

Section 544(b)(1) provides that "the trustee may avoid any transfer . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." "Under section 544(b)(1), the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who may avoid the transfer under applicable law." 5 COLLIER ON BANKRUPTCY ¶ 544.06[1] (16th ed. 2022) (citing In re Turner, 78 B.R. 166, 170 (Bankr. M.D. Tenn. 1987)). "Applicable law" is a broad term and encompasses any law that a creditor can use outside of bankruptcy to avoid the targeted transfers. See In re Gaither, 595 B.R. 201, 213 (Bankr. D.S.C. 2018). In these adversary proceedings, the unsecured creditor into whose shoes the Trustee seeks to step is the PBGC, and the "applicable law" that the Trustee relies on for avoiding and recovering the Transfers is the FDCPA. See generally 28 U.S.C. §§ 3301 et. seq.

The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt." 28 U.S.C. § 3001(a)(1). Congress passed the FDCPA to create a statutory

framework for collecting debts owed to the U.S. government.  Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp., 509 F.3d 216, 221 (5th Cir. 2007) (citation omitted).

The statute applies only to a "debt" owed to the United States, which the statute defines in two subparts:

> (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or
>
> (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States[.]

United States v. Bedi, 15 F.4th 222, 227 (2d Cir. 2021) (citing 28 U.S.C. § 3002(3)(A), (B)).

In Bedi, the Second Circuit interpreted the meaning of a "debt" under the FDCPA.  See id. at 227–28.  To qualify as a debt, the obligation must be "owing to the United States."  Id. at 227.  Therefore, the Government may not use the FDCPA to collect a debt owing to merely anyone.  Id.  Rather, the debt must be owed to the United States "such that it has a direct financial stake in the debt itself."  Id.  In other words, the United States must be the holder of the debt.  Id. at 227–28.  This interpretation of debt is reflected in the sources of indebtedness listed in subparts (A) and (B) of 28 U.S.C. § 3002(3).  Id. at 228.  These sources of debt are all instances "in which the federal treasury holds a direct financial interest in recovering the debt," id., whether it holds the debt "in its capacity as sovereign . . . or as a party to a business or financial transaction," id.  As the Fifth Circuit in Sobranes explained, this definition of a debt "pulls out from the definition those amounts owing to the United States that find their genesis in contracts where the United States was not an original party."  Id. (quoting Sobranes, 509 F.3d at 223).

7

In Bedi, a private employer failed to comply with an administrative order requiring it to remit back wages to a former employee. Bedi, 15 F.4th at 225. The Government then initiated an action to collect the back wages on the employee's behalf under the FDCPA. Id. The Government argued that the unpaid back wages fell within the definition of a debt since the Government could collect the wages on the employee's behalf. Id. The Second Circuit disagreed and held that the Government could not use the procedures of the FDCPA because the debt itself was owed to an employee, not the United States. Id. at 228–29. This decision expressly overruled the Second Circuit's holding in NLRB v. E.D.P Med. Comput. Sys., Inc. See 6 F.3d 951, 954 (2d Cir. 1993) (holding that NLRB back pay award for unfair labor practices is a debt under FDCPA).

The Second Circuit's ruling in Bedi is in line with the Fifth Circuit's decision in Sobranes. See Sobranes, 509 F.3d at 226–27. In Sobranes, a private party assignee of the Federal Deposit Insurance Corporation (the "FDIC") sought to collect on a judgment entered against a construction company using the FDCPA. Id. at 217. The Fifth Circuit held that the Government could not rely on the FDCPA to collect on the FDIC judgment given that the underlying notes were not "originally due [to] the United States." Id. at 224 (citation omitted). Critically, the Government was collecting money originally due to private parties, not to the United States. Id. at 226. It did not matter that the private lender was federally insured by the FDIC because the definition of a debt focuses on whether the United States has guaranteed the loan, not whether the institution itself is federally insured. Id. at 223. It also did not matter that the FDIC took possession of the note through receivership because the FDIC did not hold or insure the debt at the outset of the original loan transaction, nor did the FDIC alter the terms of the note. Id. at 223.

The First Circuit used the same definition of a debt in Bongiorno, which held that the Government could not use the FDCPA to collect unpaid child support as restitution in a criminal

8

case on behalf of the victims. See U.S. v. Bongiorno, 106 F.3d 1027, 1036 (1st Cir. 1997). The First Circuit explained that while collection of the debt may promote the public interest, the Government was not the holder of the debt. Id. Rather, the Government sought to collect the debt for the benefit of private parties.[2] See id. at 1039.

Although the Fourth Circuit has never expressly ruled on the definition of a debt under the FDCPA, this court will use the same definition used by the Second, Fifth, and First Circuits. This definition of a debt also is in line with an analogous decision of the Supreme Court in Nathanson v. NLRB. See 344 U.S. 25, 27 (1952). In interpreting the definition of a debt owing to the United States under the Bankruptcy Act, the Supreme Court held that an award of back pay by the NLRB was not a debt owing to the United States since funds collected would not flow to the federal treasury, but to wage claimants. Id. at 27–28.

In these present adversary proceedings, the PBGC seeks to collect a debt for the benefit of the Freedom Plan and its beneficiaries. As previously noted, the PBGC is a government corporation within the Department of Labor established by Title IV of ERISA, and in the first instance, is responsible for administering and enforcing a pension benefit insurance program. See Durango-Georgia Paper Co. v. H.G. Est., LLC, 739 F.3d 1263, 1266 (11th Cir. 2014) (citing 29 U.S.C. § 1302(a)). This pension benefit insurance program guarantees that pension plan beneficiaries will receive certain benefits if their employer is unable to pay. See Durango-Georgia Paper, 739 F.3d at 1266 (citing 29 U.S.C. §§ 1321–22). If an employer can no longer provide benefits as required, the PBGC is authorized to terminate the pension plan. 29 U.S.C. § 1342. The PBGC then typically becomes the statutory trustee of the terminated plan and is authorized to

---

[2] After this decision, Congress passed the Mandatory Victims Restitution Act (MVRA), which provides the United States with independent authority to invoke the FDCPA to enforce restitution in criminal cases, and subsequently, the First Circuit's decision in Bongiorno was expressly overruled by the holding in Witham. See U.S. v. Witham, 648 F.3d 40, 49 (1st Cir. 1997).

collect any amount due to the plan on behalf of the beneficiaries. Id. §§ 1342, 1362. The PBGC is currently the statutory trustee of the Freedom Plan.

Similar to the Bedi, Sobranes, and Bongiorno cases, the debt in this case is not owed directly to the United States. Rather, the PBGC is collecting a debt on behalf of the Freedom Plan and its beneficiaries, who are private parties. This is akin to collecting a debt on behalf of wage claimants as in Bedi. See Bedi, 15 F.4th at 228–29. Collecting the debt may promote the interests of the beneficiaries, but the debt itself will not inure to the U.S. Treasury. See Bongiorno, 106 F.3d at 1039. As noted in Sobranes, it does not matter that it is the PBGC's statutory responsibility to collect the debt owed to the Freedom Plan beneficiaries. See Sobranes, 509 F.3d at 223. The critical determination is whether the debt is owed directly to the United States. Id. Here, the debt is owed to the Freedom Plan and its beneficiaries, not to the United States.

Notably, the PBGC is not funded by the U.S. Treasury. The PBGC is funded through premiums paid by plan sponsors, which are employers that have created defined benefit plans and are required to pay insurance premiums as a contributing sponsor. See 29 U.S.C. § 1037. As a result, this case is like Sobranes. The United States has no direct interest in these adversary proceedings in its capacity as a sovereign, nor is the United States a party to a business transaction. Moreover, the United States itself is not guaranteeing the benefits to the Freedom Plan beneficiaries; rather, the PBGC is guaranteeing the debt using funds provided by private parties. The United States' only interest in this case is through the PBGC in its capacity to collect money due to the Freedom Plan. The fact that the PBGC itself is a government corporation does not matter. The United States itself must be a party to the original transaction or insure the original loan, and here, the United States did not directly provide or guarantee funding to the Freedom Plan or to the PBGC.

## **CONCLUSION**

In sum, the Transfers that the PBGC is attempting to collect on behalf of the Freedom Plan and its beneficiaries do not meet the definition of a "debt owing to the United States" under the FDCPA. As a result, the PBGC cannot invoke the FDCPA to collect the Transfers. Given that the FDCPA is not available to the PBGC outside of bankruptcy, the Trustee cannot rely on the FDCPA as "applicable law" under § 544(b). Thus, the Trustee cannot take advantage of the six-year look back period provided under the FDCPA.

All the Transfers in these adversary proceedings are over four years old. The Trustee does not plead another applicable law with a long enough look back period to avoid and recover the Transfers. Therefore, these two proceedings must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Accordingly, the court hereby **GRANTS** the Defendants' Motions to Dismiss.

**SO ORDERED.**

| | |
|---|---|
| This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order. | United States Bankruptcy Court |